IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| P. David Kemp, | ) | Civil Action No. 6:14-cv-2604-GRA-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| JHM Enterprises, Inc. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the defendant's motion for summary judgment (doc. 33).    In his complaint, the plaintiff alleges claims against his former employer for violation of the Americans with Disabilities Act ("ADA"), as amended, and a state law claim for intentional infliction of emotional distress.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The plaintiff was first diagnosed with Type 1 diabetes in his early thirties, and he takes multiple injections of insulin every day (doc. 41-10, pl. dep. 55-56).  The plaintiff's diabetes requires him to regularly monitor his blood sugar levels (*id*. at 82-83).

On July 8, 2013, the plaintiff began working as the Corporate Director of Human Resources for the defendant (doc. 33-18, pl. dep. at 54-55).  After a couple days of introductions and orientation at the defendant's corporate headquarters in Greenville, the plaintiff was scheduled to tour the defendant's hotels in Gastonia, Charlotte, and Charleston on July 10, 2013, with Regional Director of Operations Daniel Barre (doc. 41-10, pl. dep. at 66). On July 10, 2013, the plaintiff and Mr. Barre departed Greenville around 10:30 a.m. with Mr. Barre driving them in Mr. Barre's car (*id.* at 81, 85-86). The plaintiff had expected that he would drive and Mr. Barre would ride with him (*id.*).  Typically, when he's driving

himself, the plaintiff stops whenever he needs to and keeps a cooler in his car so that he can have drinks and crackers (*id.*).

Upon departure, the plaintiff asked Mr. Barre where they would eat lunch, and Mr. Barre responded that they would eat at the Charlotte property (doc. 33-18, pl. dep. at 68-69). After visiting properties in Gastonia, they left for Charlotte (*id.* at 74-75). The plaintiff and Mr. Barre ate lunch in Charlotte around 12:30 p.m., and the plaintiff thereafter toured the facility with the property's general manager (*id.* at 80). Sometime around 2:30 or 3:00 p.m., Mr. Barre and the plaintiff began driving from Charlotte to the Charleston Marriott to meet with other Company managers and/or employees, again with Mr. Barre driving (*id.* at 81). The plaintiff testified that Mr. Barre was speeding, and Mr. Barre's "driving behavior was very much scaring [him] and making [him] uncomfortable" (*id.* at 87). Approximately one hour into their trip, the plaintiff began feeling badly and told Mr. Barre that they needed to stop (*id.* at 86-87). However, Mr. Barre did not respond (*id.*). The plaintiff felt that he needed to check his blood sugar, but he did not tell Mr. Barre the reason he needed to stop (*id.*). The plaintiff knew he was having difficulty in communicating, and he tried to reach his briefcase, where he kept his snacks, in the back seat, but he was unable to open his briefcase (*id.* at 90-91). The plaintiff's low blood sugar (also referred to as "diabetic shock" or "insulin shock") progressed, and the plaintiff became unable to formulate the words to ask for help (*id.*; doc. 33-18, pl. dep. 108). According to Mr. Barre, approximately one hour before they reached Charleston, the plaintiff appeared "out of sorts" and "in a totally different world," and he tried more than once to reach behind the seat (doc. 41-8, Barre dep. 50-52, 57, 61). The plaintiff's eyes became "glossy," and he began to constantly fidget in his seat and with his fingers (*id.* at 50-51). Mr. Barre knew that "something was wrong," but he did not know what it was (*id.* at 52). When they arrived at the hotel in Charleston, Mr. Barre thought that the plaintiff needed medical attention and testified that he "probably" thought the plaintiff needed medical attention before they arrived at the hotel (*id.* at 53).

2

When they arrived at the Charleston Marriott around 7:10 p.m., Mr. Barre left the plaintiff in the car and went inside to check them into their hotel rooms and get their keys (*id.* at 65). The plaintiff was incoherent and unable to speak full sentences or open the car door, so Mr. Barre opened the door for him (doc. 33-18, pl. dep. at 95-96). Mr. Barre handed the plaintiff his overnight bag, and they walked toward the hotel (*id.* at 95). Mr. Barre testified that he realized the plaintiff was not following him, and, when he turned around, the plaintiff had unbuttoned his shirt and was swinging his suitcase (doc. 33-16, Barre dep. 66-73). At that point, Mr. Barre took pictures of the plaintiff and sent them to Sid Wall, the defendant's Vice President, Select Service Operations and Shared Services (*id.* at 74-76; docs. 33-7, 33-8, 33-9, photos). According to the plaintiff, they walked into a sitting area that was very dark with no one else was around, and Mr. Barre told him to stay there (doc. 33-18, pl. dep. at 95). According to Mr. Barre's testimony, he realized the plaintiff had left his jacket in the car, and he went back to get it for him because he thought the plaintiff "would look more presentable with his jacket" (doc. 33-16, Barre dep. at 76-77). He left the plaintiff in the pre-function area, which Mr. Barre described as "a secluded area where very few people go by" (*id.* at 84). Mr. Barre remembers seeing a few guests in the area, but he does not know of any complaints from guests regarding the incident (*id.* at 77, 81).

After Mr. Barre returned, the plaintiff testified that he was disoriented, and he remembers being very hot and sweating profusely (doc. 41-10, pl. dep. at 95-96). He took off his jacket and tried to throw it on a chair, but it hit the wall (*id.*). He also remembers his shirt was unbuttoned and that he was wearing his medic alert necklace and "trying to let them know that – you know, because I couldn't say, 'Help me,' that here's my medic alert bracelet" (*id.* at 96). He also remembers telling Mr. Barre, "Don't leave me" (*id.*).

Mr. Barre called Mr. Wall to inform him of the situation and to ask him if he had seen the pictures of the plaintiff he had sent (doc. 33-6, Barre report; doc. 33-16, Barre dep. at 63, 80-82). Mr. Barre told Mr. Wall that he needed help in getting the plaintiff medical attention (doc. 33-16, Barre dep. at 82). Mr. Barre then called Patrick Rogers, the

3

General Manager of the Charleston Marriott (*id. at 63*).  According to the report Mr. Rogers wrote regarding the incident, when he arrived, he asked the plaintiff if he had a medical condition, and the plaintiff was able to say that he was diabetic (doc. 33-17, Rogers dep. at 59-61; doc. 33-10, Rogers report).  Mr. Rogers asked the plaintiff if he wanted orange juice, and the plaintiff responded that he did (*id.*).  After a second orange juice, the plaintiff started to "come around and speak" (doc. 33-17, Rogers dep. at 62).  According to Mr. Rogers, the plaintiff was not disturbing any of the hotel guests (*id.*).  Mr. Rogers told the plaintiff that they were going to take him to the hospital, and the plaintiff reacted by standing up, "and he was just very excited about the hospital and hit the wall a couple of times with his fist" (*id.* at 63).  At that point, Mr. Rogers did not think it was safe for him and Mr. Barre to transport the plaintiff to the hospital, so he asked the front desk to call Emergency Medical Services (*id.* at 64).  Mr. Rogers gave the plaintiff a third bottle of orange juice (doc. 33-10, Rogers report).

When the medical responders[1] arrived, they performed a number of tests on the plaintiff (doc. 41-8, Barre dep. at 99).  Mr. Rogers excused himself, but Mr. Barre was present with the plaintiff and medical responders (doc. 41-10, pl. dep. at 98).  The plaintiff told the medical responders, in Mr. Barre's presence, that he was a diabetic and had a low blood sugar event (*id.*).  According to Mr. Barre, he remembers the medical responders telling him that the plaintiff had a hypoglycemic, or low blood sugar, episode (doc. 41-8, Barre dep. at 108).  The plaintiff told the medical responders that he had had three 12 ounce orange juices in the last 15 minutes (doc. 33-18, pl. dep. at 99).  After testing the plaintiff's blood sugar, the medical responders told the plaintiff that, while they did not know how low his blood sugar was prior to the orange juices, his blood sugar was up to 75[2] at that

---

[1]The plaintiff states that the defendant has refused to provide him with the names of the emergency medical responders or the employees who were working at the front desk of the Charleston Marriott and called for emergency help (doc. 41, pl. resp. at 7 n.2).  This information is also the subject of a motion *in limine* filed by the plaintiff (doc. 32).

[2]The plaintiff's target for his blood sugar is between 80 and 120 (doc. 41-10, pl. dep. at 109)

time (*id.*).  Once the medical responders were comfortable with the plaintiff's condition and determined that he did not need to go to the hospital, they had Mr. Barre "sign a paper," released the plaintiff, and left (doc. 41-10, pl. dep. at 100; doc. 41-8, Barre dep. at 103-105).

Mr. Barre testified that he called Mr. Wall that evening and told him that Mr. Rogers had given the plaintiff some orange juice and that the orange juice appeared to have alleviated the plaintiff's symptoms and that the medical responders had assessed that the plaintiff "had suffered a diabetic episode" and agreed with the plaintiff that he did not need to go to the hospital (doc. 41-8, Barre dep. at 91-92, 103-108).  Mr. Barre further testified that he and Mr. Wall discussed cancelling the tour of another hotel the next day and that he and the plaintiff would instead return to Greenville (*id.* at 92-93).  According to Mr. Barre, he told Mr. Wall that he did not "think it would be wise after what happened yesterday to continue the tour" (*id.* at 93).  Mr. Barre testified that this was "out of concern for Mr. Kemp" rather than an out of safety concerns for himself "because [he] knew what was going on" (*id.*).  Mr. Wall testified in the Rule 30(b)(6) deposition that Mr. Barre told him that the medical responders "thought [the plaintiff] was diabetic or might have had a diabetic episode" (doc. 33-14, 30(b)(6) dep. at 43-44).

The plaintiff and Mr. Barre agreed to meet for dinner in the hotel restaurant a short time later that evening (doc. 41-10, pl. dep. at 101).  At dinner, Mr. Barre told the plaintiff that he had spoken to Mr. Wall and they had cancelled the planned visits to see the defendant's properties the next day (*id.*).  Mr. Barre stated that they would instead drive back to Greenville the next day (*id.*).  During dinner, the plaintiff explained to Mr. Barre that he had been trying to find crackers and his blood testing kit when he was reaching in the backseat during their trip to Charleston.  He also explained that he could not open his briefcase or communicate what he needed due to his low blood sugar (*id.* at 101-102).  Mr. Barre responded, "Wow, oh, that explains it" (*id.* at 102).

The next morning, Mr. Barre and the plaintiff met for breakfast at the hotel (doc. 33-18, pl. dep. at 129).  Mr. Barre then went to meet with someone who applied for

5

a position, and the plaintiff met with the Human Resources Director at the hotel as he had been asked to do prior to the trip by Jane Brophy, the defendant's Vice President, Full Service Operations and Shared Services (*id.* at 130). They left Charleston at approximately 9:30 a.m. and arrived in Greenville at approximately 1:15 p.m. (*id.* at 130-32; doc. 33-6, Barre report). Mr. Barre told the plaintiff that Mr. Wall was going to meet with the plaintiff at the hotel where Mr. Barre's office was located (doc. 41-10, pl. dep. at 132). When they arrived at the hotel, Mr. Barre went to his office, and Mr. Wall explained to the plaintiff that he was waiting on Ms. Brophy to arrive (*id.*). When Ms. Brophy arrived, they went to a meeting room, and Mr. Wall read the following statement:

> JHM has the right to expect professional and appropriate behavior from its Associates, especially those in corporate leadership positions. Your actions last evening at the Marriott Charleston hotel, as described by Daniel Barre Regional Director of Operations and Patrick Rogers General Manager, were neither professional nor appropriate. They describe your behavior as incoherent, aggressive, scary, and highly unprofessional. They report that you were undressing in the parking lot of the hotel, you were slinging your coat in the air in the pre-function space of the ballroom, you were aggressively pounding your chest, you were incoherent and unable to speak or answer questions, you pounded the walls of the meeting room in a violent manner, and you were yelling in the lobby that you loved going to the hospital. They called Emergency Medical Services in an attempt to help you since they could not communicate with you. Your actions were not only witnessed by Daniel and Patrick, but by other Associates and Guests of the Marriott Charleston. Given your position of Corporate Director of Human Resources this behavior is inappropriate and unacceptable, as it would be for any Associate, regardless of their position. Effective today your employment is terminated with JHM Hotels.

(Doc. 33-11, Wall prepared stmt.). The plaintiff was surprised and caught off guard (doc. 41-10, pl. dep. 132). He asked whether they wanted to hear his side of the incident and whether they wanted any feedback from him on "what little accommodation I could possibly need because I'm diabetic?" (*id.* at 132-33). Mr. Wall responded, "No. You're being terminated for unprofessional conduct" (*id.* at 133). The plaintiff asked whether it would have been any different if he had a heart condition and had heart attack, fell against the

6

wall, ripped his shirt open, and fell across a table where people were eating (*id.* at 134). Mr. Wall responded that that situation would be different (*id.*).

Mr. Wall testified in his deposition that he read Mr. Rogers' account of what happened on July 10, 2013, prior to his meeting with the plaintiff on July 11th (doc. 41-13, Wall dep. at 42; *see* doc. 41-3, Rogers report). Prior to the termination meeting with the plaintiff, Mr. Wall knew that the plaintiff said he had diabetes and had an episode, and he had no reason to refute that (doc. 41-13, Wall dep. at 44). He was also aware prior to terminating the plaintiff's employment that the medical responders had concluded that the plaintiff had suffered a low blood sugar episode (*id.* at 63). The extent of the investigation into the July 10th incident was that Mr. Wall spoke with Mr. Barre, and Ms. Brophy spoke with Mr. Rogers (*id.* at 48). Mr. Wall testified that it would not be appropriate to terminate a diabetic who had a diabetic episode, but they "weren't terminating Mr. Kemp because of a diabetic episode. We were terminating Mr. Kemp for unprofessional behavior in the workplace" (*id.*). Mr. Wall also testified that no other factors contributed to the plaintiff's termination (*id.* at 58). Ms. Brophy also testified that the decision to terminate the plaintiff's employment because of "inappropriate" conduct had been made prior to the meeting with the plaintiff (doc. 41-9, Brophy dep. at 27, 37).

Dharmendra J. Rama, the defendant's President, testified that the normal process in such a situation would be for Human Resources to investigate the incident and get both sides of the story (doc. 41-11, Rama dep. at 17-19, 29). Mr. Rama further testified that he would be "surpise[d]" if nobody called the plaintiff prior to his termination to ask for his side of the story because "[t]hat' s not the right way it should be procedurally handled" (*id.* at 28). According to Mr. Rama, only Mr. Wall and Ms. Brophy had input into the decision to terminate the plaintiff's employment (*id.* at 33).

7

## APPLICABLE LAW AND ANALYSIS

***Standard of Review***

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

***ADA***

The ADA prohibits employment discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of

8

employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. §
12112(a). "To establish a claim for disability discrimination under the ADA, a plaintiff must
prove '(1) that he has a disability, (2) that he is a 'qualified individual' for the employment
in question, and (3) that [his employer] discharged him (or took other adverse employment
action) because of his disability.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562,
572 (4th Cir. 2015) (quoting *EEOC v. Stowe–Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th
Cir.2000)).

   The Fourth Circuit has held that the causation and burden-shifting standards
applicable in Title VII cases as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792
(1973) are also applicable in cases brought pursuant to the ADA "where the defendant
disavows any reliance on discriminatory reasons for its adverse employment action ." *Ennis
v. Nat'l Assoc. Of Business and Educ. Radio*, 53 F.3d 55, 58 (4th Cir.1995). Under the
analysis set forth in *McDonnell Douglas*, the plaintiff has the initial burden of demonstrating
a *prima facie* case of discrimination. *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124,
133 (4th Cir. 2002). If the plaintiff establishes a *prima facie* case, the burden shifts to the
defendant to produce a legitimate, nondiscriminatory reason for the plaintiff's discharge. If
the defendant meets this burden, the plaintiff must show by a preponderance of the
evidence that the proffered reason was pretext for discrimination. *See Reeves v. Sanderson
Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

   The defendant first argues that the plaintiff has failed to prove that he has a
disability as defined by the ADA (doc. 33-1, def. m.s.j. at 9-11).   The undersigned
disagrees.  "Disability" means: (A) a physical or mental impairment that substantially limits
one or more of the major life activities of such individual;(B) a record of such an impairment;
or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). A qualified
individual is "an individual who, with or without reasonable accommodation, can perform the
essential functions of the employment position that such individual holds or desires." *Id.* §
12111(8).

9

On September 25, 2008, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), which took effect on January 1, 2009.  Pub.L. No. 110–325; 122 Stat. 3553, 3553 (Sept. 25, 2008).  The ADAAA expressed congressional concern that case law from the United States Supreme Court had "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." *Id.* The ADAAA "reject[ed] the standards enunciated" in previous Supreme Court cases and stated that "[t]he definition of disability [under the ADA] shall be construed in favor of broad coverage of individuals." *Id.*; *see Summers v. Altarum Inst., Corp.,* 740 F.3d 325, 329 (4th Cir. 2014).  As the Fourth Circuit Court of Appeals recently stated:

> [The ADAAA] was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). The regulation clarifies that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." *Id*. "[T]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub.L. No. 110–325, § 2(b)(5) (2008). In enacting the ADAAA, Congress abrogated earlier inconsistent caselaw. *Summers*, 740 F.3d at 331.

*Jacobs*, 780 F.3d at 572.

The ADAAA defines "major life activities" as:

> (A) In general
> For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
>
> (B) Major bodily functions
> For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

10

42 U.S.C. § 12102(2).   The Equal Employment Opportunity Commission's ("EEOC") regulations define a "substantially limiting impairment" as one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).  "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id*.  The  regulations state that "it should easily be concluded that the following types of impairments will, at a minimum, substantially limit the major life activities indicated: . . . ; diabetes substantially limits endocrine function . . . . " *Id.* § 1630.2 (j)(3)(iii).

Congress enacted several "rules of construction" in the ADAAA, stating as follows: (1) The definition of disability shall be construed in favor of broad coverage of individuals under this Act; (2) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADAAA; (3) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability; (4) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active; and (5) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as, *inter alia*, medication and medical supplies. 42 U.S.C. § 12102(4).

Applying the foregoing law to the facts viewed in a light most favorable to the plaintiff, the undersigned finds that a reasonable jury could conclude that the plaintiff is substantially limited by his diabetes in the major life activities of speaking, communicating, and caring for himself and thus is disabled under the ADA.  *See* 42 U.S.C. § 12102(2)(A). *See also Jacobs*, 780 F.3d at 574 ("We therefore find that a reasonable jury could conclude that Jacobs was substantially limited in her ability to interact with others and thus disabled within the meaning of the ADA.").  The plaintiff has provided medical evidence showing that he has Type I diabetes and that treatment requires that he take multiple daily injections of insulin, eat at regular intervals, and watch his diet (docs. 41-4, 41-5).  For example, on May

11

18, 2011, the plaintiff's physician discussed the plaintiff's higher than "ideal" Hemoglobin A1c[3] test results.  The plaintiff's doctor noted that the plaintiff "had some low and some high readings that he attributes to being at work long hours and then sometimes not getting food when he is supposed to and sometimes eating the wrong thing at business meals" (doc. 41-4).  The plaintiff's doctor "told him that diabetes was a terrible disease and unfortunately he has to try to be more regimented in his food and insulin as well as his diet program" (*id.*).  The plaintiff also testified that he must regularly check his blood sugar levels and must have food available in order to avoid hypoglycemic episodes (doc. 41-10, pl. dep. at 82-84).  When he has low blood sugar, he sometimes has double vision, perspires profusely, becomes unsteady on his feet, and cannot "put words together" (*id.* at 109-10).  The plaintiff further testified that having blood sugars that are too high for too long can result in "losing your sight, your fingers fall off and your heart stops working because prolonged high blood sugar is long-term the worst thing to happen to you" (*id.* at 111).  The plaintiff testified that physical activities like playing golf and mowing the yard require him to get his blood sugar to a safe level prior to starting and also require that he have food and drinks available (*id.* at 122-23).  The plaintiff's target for his blood sugar is between 80 and 120 (*id.* at 109).  At the time he was diagnosed, he had been "feeling bad for a while," was dehydrated, was losing weight rapidly, and his blood sugar was at 800 (*id.* at 109-12).  He was put into the hospital and given IVs until his blood sugar came down (*id.* at 112).  The plaintiff has had instances of low blood sugar at work, including during a meeting where a co-worker realized what was happening and brought him an orange juice, which allowed him to continue with the meeting  (*id.* at 113-14).

The defendant argues, "Although Plaintiff believes his misconduct was caused by 'insulin diabetic shock,' no physician or medical doctor ever diagnosed the incident as such or concluded that any causal connection existed between the misconduct and the

---

[3]The test reflects a person's average blood sugar level for the past two to three months. *See* http://www.mayoclinic.org/tests-procedures/a1c-test/basics/definition/ PRC-20012585 (last visited Oct. 30, 2015).

alleged shock" (doc. 33-1, def. m.s.j. at 6).  The defendant also notes that the plaintiff testified that the "paramedics 'would be in the capacity to give you a better . . . certification of . . . what caused that'" (doc. 33-18, pl. dep. 146-47), but faults the plaintiff for failing "to produce any documentation or testimony from the paramedics" (doc. 33-1, def. m.s.j. at 6). However, as noted above, the plaintiff requested in discovery that the defendant provide information regarding the identity of the medical responders, but the defendant responded that the names of the responders and their employer were unknown (*see* doc. 32, m. *in limine* at 11).  Furthermore, both Mr. Barre and Mr. Wall testified that Mr. Barre told Mr. Wall prior to the plaintiff's termination from employment that the medical responders assessed that the plaintiff had a "diabetic episode" (doc. 41-8, Barre dep. at 91-92, 103-108; doc. 33-14, 30(b)(6) dep at 43-44).

The defendant cites *Schneider v. Giant of Md., LLC*, 389 F. App'x 263, 268 (4th Cir) (affirming summary judgment for an employer because a diabetic employee failed to show thta his diabetes constituted a disability under the ADA) in support of its argument that the plaintiff does not suffer from a disability (doc. 33-1, def. m.s.j. at 10).  However, *Schneider* was not decided under the ADAAA, which, as discussed above, was intended to make it "easier for people with disabilities to obtain protection under the ADA." 29 C.F.R. § 1630.1(c)(4). In a recent case decided under the ADAAA by the United States District Court for the District of Connecticut, the court considered whether a plaintiff who suffered from diabetes and high blood pressure had a disability under the ADA.  *Willoughby v. Connecticut Container Corp.*, No. 3:11-cv-992(CSH), 2013 WL 6198210, at *9 (D. Conn. Nov. 27, 2013).  The plaintiff claimed to have suffered from an episode of hypoglycemia and dehydration that caused him to pass out at work, and he was subsequently terminated from employment for sleeping on the job .  *Id.* at *2-4.  The court found as follows:

> Such symptoms and complications [resulting from diabetes and high blood pressure] then included hyperglycemia, dehydration, tachycardia, high blood sugar, difficultly standing, and dizziness and faintness, as detailed *supra*. The Court finds, given the expanded interpretation of the definitions of "disability" and "major life activity" directed by the ADAAA, that Plaintiff—who

13

suffers these symptoms due to diabetes, which is by definition a disease which impacts the functioning of the endocrine system—could indeed easily be found by a jury to be an individual who has "a physical impairment that substantially limits one or more major life activities of such individual" and, accordingly, has a disability under the ADA. See 42 U.S.C. § 12102(1). As EEOC regulations themselves note, "diabetes substantially limits endocrine function," and therefore "it should easily be concluded that [diabetes] will, at a minimum, substantially limit" what amounts to a major life activity. 29 C.F.R. § 1630.2(j)(3)(iii).

*Id.* at *9. Moreover, as set forth above, the regulations provide that the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," which would include the insulin taken by the plaintiff. 29 C.F.R. § 1630.2(j)(1)(vi), (5)(i).

The defendant next argues that the plaintiff's "misconduct defeats his ADA claim" (doc. 33-1, def. m.s.j. at 11). Specifically, the defendant argues that the plaintiff's "alleged disability did not excuse his misconduct and aberrant behavior" and notes that the defendant required employees "to project 'a favorable image of JHM Hotels to the public at all times' and to maintain 'a clean and neat appearance at all times'" (*id.* at 12 (quoting doc. 33-5, job description)). The defendant characterizes the plaintiff's conduct as including "disrobing" and "twirling a suitcase in the air" while guests gave "shocked" looks (*id.* at 12-13). However, the evidence viewed in a light most favorable to the plaintiff is that no guests were disturbed. Moreover, the actual testimony by Mr. Barre was that the plaintiff "unbuttoned his shirt," not that he "disrobed," and he was "jerking his suitcase above his head," rather than "twirling" it (doc. 33-16, Barre dep. 66-75; *see also* doc. 33-6, Barre report). Furthermore, with the accommodation the plaintiff received from previous employers, which included opportunity to test his blood sugar and to have orange juice and other food available, he would be able to avoid the type of hypoglycemic episode that he experienced here (doc. 33-18, pl. dep. at 82-84). Accordingly, the undersigned finds that

14

the plaintiff has presented sufficient evidence to show that he is a qualified individual for the position in question (*see* doc. 33-1, def. m.s.j. at 3 (noting that the plaintiff had "extensive experience working, for nearly 20 years, in HR, as he had served as an HR executive, director, and/or manager in several large companies . . . .")).  *See* 42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.").

The undersigned further finds that the plaintiff has presented evidence upon which a reasonable jury could find that the defendant terminated his employment because of his disability.  Here, the defendant admits that the sole reason for the plaintiff's termination was the incident on July 10th.  The defendant argues that the plaintiff failed to prove any inference of discrimination because "when [the defendant] fired Plaintiff, the Company did not know that he was disabled, as defined by the ADA, or that he needed an accommodation" (doc. 33-1, def. m.s.j. at 16).  As argued by the plaintiff, this position is meritless:

> Under [the defendant's] proposition, unless Mr. Wall and Ms. Brophy, the principal decision-makers . . . regarding [the plaintiff's] termination, were medical doctors able to definitively diagnose [the plaintiff's] condition AND had a legal education which would enable them to determine the legal definition of "disability" under the ADAAA, [the defendant] should be absolved from any liability under the ADAAA.

(Doc. 41, pl. resp. m.s.j. at 3).  The plaintiff has presented evidence that the decision-makers knew he had told Mr. Barre that he had diabetes and that the symptoms he experienced on July 10th were as a result of his low blood sugar.  The plaintiff has also presented evidence that the decision-makers knew that the emergency responders indicated that the plaintiff had suffered a "diabetic episode" or hypoglycemic event at the time of the incident (doc. 41-8, Barre dep. at 91-92, 103-108; doc. 33-14, 30(b)(6) dep. at

15

43-44).  Whether or not Mr. Wall and Ms. Brophy had reached a conclusion regarding whether or not the plaintiff was disabled *as defined by the ADA* is irrelevant to the analysis of the plaintiff's claim.

In *Willoughby*, the ADA case from the District of Connecticut discussed above in which the plaintiff claimed to have suffered from an episode of hypoglycemia that caused him to pass out at work, the court found as follows:

> Even assuming that Defendant were able to credibly articulate a legitimate and non-discriminatory reason for having terminated Plaintiff's employment, for example that those making the decision to discharge Plaintiff had not known of Plaintiff's disability, or that, furthermore, these individuals really did believe that Plaintiff had fallen asleep rather than passed out and terminated his employment accordingly - arguments Defendant has in fact put forth in its pleadings - the Court would still unequivocally find, on the factual record discussed at length supra, that a genuine factual dispute exists as to the veracity of such claims. Plaintiff has successfully "set forth specific facts demonstrating that there is a genuine issue for trial." *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted). There is no question, given the evidence that it was clear to several of the decision-makers, in particular Besen, that Plaintiff was a diabetic at the time of his termination and the denial of his subsequent appeal, that these individuals knew that the incident in question- the only factor they seem to cite in their reasons for discharging him, aside from the drug policy claims not substantially raised in Defendant's summary judgment pleadings - stemmed from his illness and not from his merely deciding to sleep while at work; and, furthermore, given evidence that Plaintiff's termination was not wholly consistent with the way in which Defendant has handled "sleeping" employees in the past, that a reasonable jury *could* decide in Plaintiff's favor on the question of whether Plaintiff had been wrongfully discharged under the ADA. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). It is "[o]nly when reasonable minds could not differ as to the import of the evidence" that summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

*Willoughby*, 2013 WL 6198210, at *11.  Similarly, here, the plaintiff has presented sufficient evidence of pretext to survive summary judgment.  In addition to the evidence cited above showing that the decision-makers knew that the incident in question – the only reason for

the plaintiff's termination from employment – stemmed from his diabetes, the plaintiff has presented evidence that the decision-makers did not investigate the plaintiff's side of the story prior to making the decision to terminate his employment, which, according to the defendant's President, was not the normal process (doc. 41-11, Rama dep. at 17-19, 28-29).  Based upon the foregoing, the district court should deny summary judgment on the plaintiff's claim of wrongful discharge in violation of the ADA.

The defendant further argues that the plaintiff's failure to accommodate[4] claim cannot survive summary judgment (doc. 33-1, def. m.s.j. at 16).  To establish a *prima facie* case against his employer for failure to accommodate, a plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position ...; and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir.2013) (brackets and citations omitted).

The undersigned finds that the plaintiff has presented sufficient evidence on the first three requirements of a *prima facie* case of failure to accommodate, as discussed above.  With regard to the fourth requirement, the defendant first argues that the plaintiff never requested an accommodation (doc. 33-1, def. m.s.j. at 16).   However, the plaintiff has presented evidence that he did request accommodation for his diabetes at the meeting with Mr. Wall and Ms. Brophy (doc. 41-10, pl. dep. at 132-33).  The defendant argues that the plaintiff requested an accommodation "after he learned of his termination," and thus his claim fails (doc. 33-1, def. m.s.j. at 16).  The defendant cites *Judge v. Landscape Forms,*

---

[4]As noted by the defendant, the plaintiff curiously states in his response in opposition to the motion for summary judgment that "[t]his is NOT a reasonable accommodation case. . . . After being put on notice that Kemp suffered a diabetic episode, JHM should have consulted with Kemp regarding a reasonable accommodation, but that is a peripheral issue to the heart of this lawsuit: JHM's termination of Kemp because of [his] diabetes and the diabetic attack . . . on July 10, 2013" (doc. 41, pl. resp. m.s.j. at 30 n.12).  However, the plaintiff clearly alleged in his complaint that the defendant failed to make reasonable accommodations (doc. 1, comp. ¶¶ 20, 21, 24, 25), and he argues against dismissal of the failure to accommodate claim (doc. 41, pl. resp. m.s.j. at 30-33).

*Inc.*, 592 F. App'x 403 (6th Cir. 2014) as a similar case. In *Judge*, the Sixth Circuit Court of Appeals found that summary judgment was properly granted on the plaintiff's ADA failure to accommodate claim because the plaintiff's request for accommodation was made in a telephone call after he was told that he was being fired. *Id.* at 408. The court stated, "[T]he employer must first be given a chance to grant or deny an accommodation while the employee is still presently employed in order for the employee to allege that the employer failed to accommodate him or her." *Id.* (citing *Melange v. City of Ctr. Line*, 482 F. App'x 81, 86 (6th Cir. 2012)).

It is true that the "duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." *Wilson*, 717 F.3d at 346-47 (citing *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011)). However, here, the timing of the plaintiff's start of employment, the plaintiff's low blood sugar episode, the defendant's learning of the plaintiff's disability, and the termination meeting in which the plaintiff requested an accommodation is compressed into a four day period. The plaintiff began work on Monday, went to Charleston with Mr. Barre on Wednesday and had the hypoglycemic episode that afternoon, and was terminated from employment the next day (Thursday), which was the first time he had an opportunity to speak with Mr. Wall since having the hypoglycemic episode. According to the plaintiff, in the meeting, Mr. Wall "without much preface or anything, took out a sheet of paper, read a statement from a sheet of paper that recounted the events of the previous day," and, at the end of the statement, told the plaintiff that he was being terminated from employment (doc. 41-10, pl. dep. at 132).

The Fourth Circuit recently stated:

The ADA imposes upon employers a good-faith duty "to engage [with their employees] in an interactive process to identify a reasonable accommodation." *Wilson*, 717 F.3d at 346. This duty is triggered when an employee communicates her disability and desire for an accommodation - even if the employee fails to identify a specific, reasonable

accommodation. *Id*. However, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of the position. *Id*. at 347; *see also Deily v. Waste Mgmt. of Allentown*, 55 F. App'x 605, 607 (3d Cir.2003) (citing *Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 360 (3d Cir.2002)). Two of our sister circuits have held that failure to "discuss a reasonable accommodation in a meeting in which the employer takes an adverse employment action" against a disabled employee is evidence of bad faith. *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir.2014) (citing *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 622 (5th Cir.2009)).

*Jacobs*, 780 F.3d at 581.  In *Chevron*, cited by the Fourth Circuit above, the Fifth Circuit Court of Appeals noted that in the plaintiff's meeting with decision-makers in which she was suspended, the decision-makers asked her about her chronic fatigue syndrome "but did not discuss any accommodations with her.  Thus a jury reasonably could find that [the defendant], instead of engaging in the interactive process that the ADA requires, simply refused to consider [the plaintiff's] request for accommodation."  570 F.3d at 622. Furthermore, "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).

The evidence before the court, viewed in a light most favorable to the plaintiff, is that, when the plaintiff arrived back in Greenville the day after the incident, he met with Mr. Wall and Ms. Brophy, and was "was surprised and caught off guard" when Mr. Wall read a prepared statement that concluded with "Effective today your employment is terminated . . . ." (doc. 41-10, pl. dep. 132; doc. 33-11, Wall prepared stmt.).  The plaintiff had expected that they would discuss the previous day's events and asked Mr. Wall and Ms. Brophy whether they wanted to hear his side of the incident and whether they wanted any feedback from him on "what little accommodation I could possibly need because I'm diabetic?" (doc. 41-10, pl. dep. at 132-33). Mr. Wall responded, "No. You're being terminated for unprofessional conduct" (*id*. at 133).  Given the evidence that the defendant

19

terminated the plaintiff's employment less than 24 hours after learning that the plaintiff had diabetes and that the conduct in question was as a result of his diabetes, that the plaintiff was terminated without the sort of investigation that, according to the defendant's President, would normally be done in such a situation, and that the plaintiff specifically requested accommodation of his disability in the meeting with Mr. Wall and Ms. Brophy, the undersigned finds that a reasonable jury could find that the plaintiff has adequately demonstrate the facts necessary to prevail on an ADA failure to accommodate claim. Accordingly, summary judgment should be denied on this claim.

***Intentional Infliction of Emotional Distress***

The plaintiff has also alleged a state law claim for intentional infliction of emotional distress (doc. 1, comp. ¶¶ 27-30). Specifically, the plaintiff alleges:

> Defendant JHM intentionally engaged in conduct which was extreme and outrageous and which was certain to cause emotional distress to Plaintiff Kemp and did in fact cause distress to Kemp by summarily and pretextually terminating Kemp's employment with JHM without warning or an opportunity to engage in a proper dialogue regarding reasonable ways to accommodate Kemp's medical condition and disability; and without proper investigation into Kemp's disability and the means of reasonably accommodating same.

(Doc. 1, comp. ¶ 27).

The defendant argues that the claim should be dismissed because the South Carolina Workers' Compensation Act ("the Act") provides the exclusive remedy for an employee who sustains work-related physical or mental injuries, which includes those injuries the plaintiff allegedly suffered as a result of his termination from employment by the defendant (doc. 33-1, def. m.s.j. at 19). The undersigned agrees.

The exclusivity provision of the Act provides in relevant part:

> The rights and remedies granted by this title to an employee when he and his employer have accepted the provisions of this title, respectively, to pay and accept compensation on account of personal injury or death by accident, shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin as against

20

his employer, at common law or otherwise, on account of such
injury, loss of service or death.

S.C. Code Ann. § 42-1-540.  The only exceptions to the exclusivity provision are: (1) when the injury results from the act of a subcontractor who is not the injured person's direct employer; (2) when the injury is not accidental but rather results from the intentional act of the employer or its alter ego; (3) when the tort is slander and the injury is to reputation; or (4) when involving certain occupations expressly excluded by the Act. *Cason v. Duke Energy Corp.*, 560 S.E.2d 891, 893 n. 2 (S.C. 2002).

Here, the plaintiff focuses on the second exception listed above, arguing that "binding case law" provides the exclusivity provision does not bar such a claim "if that infliction results from intentional discrimination" (doc. 41, pl. resp. m.s.j. at 33-34).  In *Dickert v. Metropolitan Life Ins. Co.*, 428 S.E.2d 700 (1993), the Supreme Court of South Carolina noted that it had recently held that an employee's action against a company for intentional infliction of emotional distress caused by the action of another employee was within the scope of the Act since the action arises from personal injury. *Id.* at 701 (citing *Loges v. Mack Trucks, Inc.*, 417 S.E.2d 538, 540 (S.C. 1992)). The court further clarified that holding, stating, "It is only when the tortfeasor/co-employee is the 'alter ego' of the employer that the liability falls outside the scope of the Act." *Id.*  The alter ego exception applies only to "dominant corporate owners and officers." *Id*. (quoting 2A Larson, *Workmen's Compensation*, §§ 68.21 and 68.22).

In his response to the motion for summary judgment, the plaintiff requests that the defendant "be sanctioned under Federal Rule 11(b)(2) for advocating a legal argument that [the defendant] knows to be frivolous and contradicted by binding case authority" (doc. 41, pl. resp. m.s.j. at 34 (citing doc. 41-7, email to opposing counsel)).  The plaintiff's argument is meritless.  The plaintiff cites three District of South Carolina cases as "binding authority" on the issue of whether claims for intentional infliction of emotional distress are barred by the exclusivity provision of the Act (*id.* at 34 n. 13). However, in those cases, the judges denied *motions to dismiss for failure to state a claim* pursuant to Rule 12(b)(6),

finding that the complaints "could be construed under the notice pleading utilized in federal court to allege that an alter ego of the defendant engaged in the acts of which the plaintiff complains." *Palmer v. House of Blues Myrtle Beach Restaurant Corp.*, C.A. No. 4:05-3301-RBH, 2006 WL 2708278, at *3 (D.S.C. Sept. 20, 2006). *See also Anderson v. Federal Express Corp.*, C.A. No. 4:09-3039-TLW-SVH, 2010 WL 3609103, at *2 (D.S.C. May 12, 2010) ("Further factual development is necessary to allow the Court to determine the following: (i) which members of the Defendant corporation, if any, allegedly failed to investigate or reinstate Plaintiff . . . .") ; *Todd v. Federal Express Corp.*, C.A. No. 4:09-1501-TLW-TER, 2010 WL 1294070, at *2 (D.S.C. Mar. 29, 2010) (same).

Here, the case is before the court on a motion for summary judgment. The evidence presented in this case shows that the actors who allegedly "summarily and pretextually terminat[ed] Kemp's employment with JHM without warning or an opportunity to engage in a proper dialogue . . ."  (doc. 1, comp. ¶ 27) are Mr. Wall and Ms. Brophy. However, the plaintiff has presented no evidence that either of these persons are the "alter ego" of the defendant as defined in *Dickert*.  428 S.E.2d at 701. Accordingly, the defendant's motion for summary judgment should be granted as the Act's exclusivity provision bars the plaintiff's cause of action for intentional infliction of emotional distress. *See Addison v. CMH Homes, Inc.*, 47 F.Supp.3d 404, 429 (D.S.C. 2014) ("[T]o remove a claim from the scope of the Workers' Compensation Act, a plaintiff must show that the alleged bad actor is the alter ego of the employer and [the plaintiff] presents no evidence to demonstrate that any of the [defendant's] employees discussed in this case constitute an alter ego of the defendant.") (citations omitted)); *Sutton v. Securitas Sec. Services, USA, Inc.*, C.A. No. 4:13-2542-MGL, 2014 WL 1513867, at *3 (D.S.C. Apr. 16, 2014) ("The undersigned agrees with Defendant that dismissal of the IIED claim is appropriate because Plaintiff has not shown that her supervisor is a "dominant owner or officer" of Defendant."); *Woods v. Haig Point Club Community Ass'n, Inc.*, C.A. No. 9:11-1161-SB-BM,  2011 WL 4968991, at *6 (D.S.C. Sept. 29, 2011) ("While Plaintiff is correct that a claim is not barred by the exclusivity provision of the Workers Compensation Act where the injury is not

accidental, but rather results from the intentional act of the employer, again that exception only applies where the allegedly intentional conduct was committed by the employer through an 'alter ego' of the employer itself."), *R&R adopted by* 2011 WL 5008424 (D.S.C. Oct. 18, 2011).

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 33) be denied as to the ADA claims and granted as to the state law claim for intentional infliction of emotional distress. The parties participated in mediation on September 30, 2015, but did not make progress toward resolution. According to the mediator, further mediation after disposition of the motion for summary judgment might prove beneficial (*see* doc. 51). Accordingly, should the district court adopt this recommendation, the undersigned also recommends that the parties be required to participate in further mediation of this case.

IT IS SO RECOMMENDED.

Kevin F. McDonald
United States Magistrate Judge

November 4, 2015
Greenville, South Carolina

23